May it please the court, my name is Charles Koh and I represent the appellants in this case. I would reserve five minutes of my time and with the understanding there may be questions along the way. If the court wants anything additional, let me know. I have a question. Yes. Your client got horrible medical care and she had a horrible aftermath of her medical care. I don't think there's much question about that and I think that's in the findings of fact. Here's my problem. There's no particular reason to believe she had the cancer in 2001. If I understand the facts right, and I want you to listen to me on this because you know better than I do, and I may understand the facts wrong. If I understand the facts right, she never went to the hospital in 2002 until October. In October, the doctors thought, ah, you got a stomachache, gastroenteritis, no big deal. And they were wrong in all likelihood. But we don't know. She may have had cancer in October. She would have had to go to Anchorage to get the CT scan. She didn't have any testimony. She would have gone to Anchorage immediately if they told her they have to go to Anchorage for a CT scan. When she did go to Anchorage, it was January, three months later, when they finally sent her to Anchorage. And she had the fairly advanced cancer then and got her surgery in January. So I think what you have to prove and where the district court thought you missed an element was that the failure to do the screening in October caused the cancer to be a whole lot worse than it would have been if they had done the screening in October. Have I got the facts right? And what's the matter with that analysis? I think, Dean, your analysis is correct. Let me just make it a little bit maybe even more succinct. There was two cases presented to the court essentially on damages and malpractice. There was one, as you say, from 2000 to October, the failure to diagnose, the failure to screen, the failure to properly screen her. There's no question about the negligence. It's just causation. It's causation. That was one area where we argued there was causation. How do you get it? I mean she didn't testify that she would have gone to Anchorage immediately had she been told to go to Anchorage in October. Oh, in October. I think the testimony I think that we had there is that my understanding is that she would have followed the recommendations if that was recommended. That's the way I remember the case is that she was really concerned about cancer at all times, and had she been told what she needed to follow up. She had done that in the past. Did the testimony come out she just said I would have followed or I would have immediately gotten on a plane? What did she say? I think the testimony, and like I said, I'd have to look at it real quickly, that she would have followed that advice on the CT scan. As far as the same thing, what we're really arguing here, and why it's confusing, is there's two periods of damages, and it's essential that the court understand is that from October, what we felt that we met our burden, clearly met our burden, is from October 2nd until January 7th when she went into Anchorage. This is what my presentation would be to the court. Well, just maybe let me give you a little additional facts to incorporate into it that you can cover. What evidence clearly demonstrates that Mrs. How do you say her name? Edgeman. Edgeman. All right, thank you. Demonstrates that Mrs. Edgeman's cancer would have been detected in October of 2002 had the doctors at Kanekanek Hospital ordered a pelvic exam, a CA-125 blood test, and a pelvic ultrasound or a CAT scan. And then also, the district court, it appears, relied on the testimony of the government's expert in determining when Mrs. Edgeman's cancer could have been detected. And so we've got testimony from an expert that says it most likely wouldn't have been detected even if that had been done in October, sort of breaking that chain. And there was a trial, so how do we get past all of that? You have to show clear error on that, right? Yes, I understand that. And here's where I feel the clear error was. Let's take it in components. I have three doctors, if not all of the doctors, saying on a more likely than not basis she had stage 3 in October. No question about that. If you look at Dr. Sainz, their expert, Dr. Desai, very clearly said she had stage 3 in October. But do they say it could have been detected in October? Because there was testimony about the difficulty of detection. All three of them say, and I think all four of the witnesses in here who are the doctors say that 75% to 80% of the women are found at stage 3 and 4. That's where they're found. Where it gets confusing with the statistic is this other 20%. On a more likely than not basis, 75% to 80% of the women, if checked, if gone through things, they'll find cancer. And that's what the statistics are. So if she'd gotten a CT scan in October, your proof shows she probably would have been detected. Well, I'm saying, number one, Dr. Gavi clearly says she would have been detected. I shouldn't believe him. What he's saying is you would have found a mass on the CT scan. That's what he's saying. He also said, and this was not disbelieved or anything, at page 15 of volume 2, he also says that a pelvic ultrasound, which was never done in this case, would have more likely not been detected. The judge didn't believe him. He wanted to go with the oncologist instead of the gynecological internist. No, he accepted Dr. Gavi on certain things that it's on the CT scan. There was a dispute between, and that's why we say under, if you're following Alaska statute real closely, 540.3, it's a little bit different than if you read it. It basically says when you read that statute, which is important, it says that, number three, that an approximate result of the failure to exercise the degree of care the plaintiff suffered injuries would not have otherwise occurred. In other words, it's a little bit different. It is in some ways approximate cause, but it's not. When you read that, it's a difference with the statute. We tried to point that out in our briefing, that our statute is somewhat different. What did the government's experts say that the court did choose to rely on? The government's experts said that each expert said that she had it, stage three. The experts also said that she had it. What did the government's experts say? What did the government's experts say about the detection factor in October? The detection factor in October? I think the government's experts, all they said is more likely than not that the symptoms she had were classic symptoms of ovarian cancer. That was what Dr. Desai said. Dr. Desai said that at, and I can quote you the reference on that page. There was no expert put on by the government that would say it wouldn't have been detected or more likely than not would not have been detected in October? No. What they're saying is that what they said is cancer can be hard to detect at early stages. It's very critical when you read those statistics is that you consider at early stages because the 75, we got in this roundabout of 75 to 80%. Finally, what we found that we're saying is that we pick up 75 to 80% of the women. We either pick them up in a form of several ways, by testing, by exam, by complaint. That's how we pick that degree, but we pick them up at stage 3 and 4. Assuming that there was negligence in October of 2002 in not running the tests that more likely than not would have detected the stage 3 cancer, is there any evidence other than her saying, I would have done what the doctors told me to do, that she would have had any better outcome? Yeah, that's one of the keys of why we are appealing because the conclusion said we didn't prove damages from that. We're talking about better outcome. We can't argue about stages in that. First of all, the outcome that the government's arguing is, would she have surgery? Did she testify she had the money to go to Anchorage in October? Yeah, I think there was testimony that, first of all, I don't want to jump into her testimony. Here's the thing. Let me tell you what I'm getting at. Would she have done it anyways? My doctor has been pretty routinely referring me for CT scans when he thinks there may be something worth looking at. Not very hard in Fairbanks. You're out in the bush. They don't have the machine. It's kind of a big deal. You have to fly. It's like when one of our doctors says, well, you have to go to Seattle for this or you have to go to Anchorage for this. Kind of a big deal. You try to put off the trip until it's convenient. And it seems like you need some kind of showing that she would have gotten her surgery in October instead of January in order to show that the negligence by the doctors was the cause of her cancer advancing so much that there were much worse consequences. Well, I think where we show that is she's testified that she had a concern at all times about cancer. I mean, she has this family history. Yeah, no question she testified about that. She testified about that. Then the question would be at the time is that when you're talking about money to come in and she talked about that she was able to get a flight when it became serious right away along with people, and I think she testified. It's Dillingham, right? Right, but she testified that the family, the Shade family, and I thought there was some testimony, and once again, I don't want to misstate the record, and I apologize for that. There was some testimony. I thought that she was interconnected with the Shade family, who was Shade Flying Services, and that she would have been able to come. You said her was part of the family that owns the Flying Services? Yes. So she doesn't have to come on Alaska Airlines. But, you know, she would have had the ability to come in. You're at three minutes. Do you want to reserve? Okay, I'm sorry. In the classic, when Dr. Desai, what you're looking at, number 100. I said, do you want to reserve three minutes? Yes, I'll reserve it. Okay, thank you. I was referring to Section 100 of Volume 3. Okay, thank you. Good morning. Good morning, Your Honor, members of the panel. My name is Gary Guarino. I'm with the U.S. Attorney's Office here representing the United States. Let me tell you what worries me. I have frequently been in a situation, I would guess anyone over 60 has been in a situation, where the doctor tells you you ought to have something done, and you want to do it at a convenient time, like the next time you're going outside anyway to Seattle or further south. And sometimes the doctor says, no, no, no, it's too dangerous to put this off. You've got to do it right now. So, you do it right now. And it looks like this, I can't remember which, I think it was Dr. Barbara Wallace, thought, oh, you just have a stomach ache, and didn't even do an ultrasound, let alone say you better get a CT scan right away considering your symptoms and family history. What is the evidence she wouldn't have gone to Anchorage right away and gotten it done? Two points. One, Your Honor, the expert testimony was that Dr. Wallace's assessment of her condition in October, given her presentation at that time, was reasonable. It is only in hindsight that the expert testimony was reasonable. But what a lot of doctors do is they say, well, it's probably just a stomach ache, probably just a little flu, but considering your family history, I better rule out cancer since everybody else in your family gets it. Well, but I think also, too, the testimony, you're stuck, just like a parent's lawyer may be stuck with certain findings and has to show they're wrong, you're stuck with the finding that the district court concluded that Kanekanek Hospital breached its fiduciary duty in not performing the three annual exam tests and or a CAT scan in October of 2003, given her history of cancer. So you're stuck with that. One qualification of that statement of fact, Your Honor, the district court found that the breach of the standard of care was the failure to do the annual screening exams in December 2001 or in October 2002. The district court specifically found that a CT scan was not required in October 2002 and that was not a breach of the standard of care. The court relied, rejected Dr. Gabby's testimony, relied on the testimony of the gynecological oncologist for the government, the only specialist in this area who testified, and they said that the assessment of her condition in October 2002 was reasonable given her presentation. It was based on several underlying factors. One, her presentation in October 2002 was not the classic presentation for ovarian cancer. She did not come in reporting a history of frequent episodes of abdominal pain and distension and bloating. That really doesn't prove as much as you need to prove. Doctors all the time say it's probably this, but we better rule out this, and the negligence is in failing to rule out the less common but more serious explanation of the symptoms. But the district court did not make any finding that that occurred here. The court did not say there was negligence because they didn't order a CT scan in order to rule out alternative theories. What the district court found was, based on the expert testimony of Dr. Desai and Dr. Saenz, her presentation in October 2002, they reasonably did an X-ray and an exam. They assessed the X-ray and diagnosed a small bowel obstruction. Dr. Wallace offered to admit her to do a further workup, and Mrs. Edgman refused. She declined to be admitted, and she left. Dr. Wallace said, well, you need to return in several days because we need to follow up and see if your bowel obstruction has cleared up. She returned in three days. They took another X-ray, and it appeared to have cleared up, and her condition was improved after being given IV fluids. What about in finding number 37? The district judge says even if a CT scan had been recommended to her in October, she didn't show that she would have, it says, whether and if so when Mrs. Edgman would have traveled to Anchorage for a CT scan and cannot be readily ascertained from the evidence. Is it true that she testified, I would have gone right away if they told me I should get a CT scan? There was no testimony on that point, Your Honor. The closest parallel in the record was in 2001. She had been referred for an examination of a lump in her breast for breast cancer. She had had a prior, in her medical record, she had had a prior biopsy years before, and she was concerned about breast cancer, and that was one of the things she raised as a concern. She was referred. How soon did she go? Three months later. She was referred in March of 2001, and she ended up going to Anchorage in June of 2001 to be examined by a specialist in breast cancer at that time. So there was a substantial delay. That was the only circumstantial evidence of the delay. And the court's findings, the district court findings that you referred to are in the alternative. In finding of fact 36, the court finds that a CT scan was not required based on Dr. Sines' more convincing testimony. He accepted Dr. Sines, the government's expert, over the testimony of Dr. Gavi, who said that he thought a CT scan was required in October 2002. Dr. Gavi is an internal medicine physician. He doesn't treat or diagnose ovarian cancer patients. He's not a specialist in that area. Dr. Sines and Dr. Desai, the government's experts, are. What was the testimony regarding, from the government's perspective, what was your best testimony regarding whether, had she had a CT in October, what was the testimony about whether it would have been detected? Because my understanding is that the district court said it was her burden to prove by a preponderance of the evidence that her cancer could have been detected in October of 2002 and said she didn't meet that burden, right? And there are two aspects to that, Your Honor. The only breach that the district court found was a failure to do the annual exam, which is pelvic exam, CA-125, and a pelvic ultrasound. The court said no causation in December 2001 because it's very likely she didn't even have cancer in December 2001, and even if she had it, it would have been such an early stage. Those screening tests would not detect it, and that's based on the testimony of the government's two experts. In October 2002, the court said the annual exams, which were not required because of her symptoms. The district court did not find that she had symptoms that required those exams. It just said, well, since she didn't do an annual exam in December, when she came back 10 months later in October, an exam should have been done then or at some follow-up appointment, and you didn't do that. And the court said those exams might have, it's not clear, might have detected it or might not and determined the plaintiff failed to meet the burden of proof based on the expert's testimony that those annual screening exams are not effective screening exams. And the statistics, they don't find 75% of the women with ovarian cancer. The problem with the screening exams is, according to testimony of Dr. Sines, is that even with women who are identified at high risk, they know these women are at high risk. They're carefully following them. Every six months, they're getting exams. They're going for annual pelvic exams and screening exams. They don't detect it at an early stage. They miss it until it's already too late. And that's even with women who they specifically identified, not just the general population, but women at high risk, where they're following them for that very specific reason. They still miss a substantial number of those patients because the screening exams are not reliable. Now, separately, there's this issue of the CT scan. That is a much more effective test to find cancer. And Dr. Desaia said if you were going to detect her cancer in October, which, and let me back up one point, no one said she had symptoms that indicated ovarian cancer in October. It was just the governance experts said, given her presentation in October, we can, in January, we can have... You're quite right. She had symptoms consistent with anything from the flu to a bowel obstruction to ovarian cancer to any number of other things in October. It was most probably the bowel obstruction, but what most good doctors do is they rule out other things. Based on the evidence, both experts said that, in hindsight, they could go back and say, yes, she had cancer in October 2002, but that based on the presentation to the family practice doctors in October 2002, it was reasonable for Dr. Wallace to conclude she improved with IV fluids, her X-ray improved, therefore it must have been a small bowel obstruction that resolved, and she never came back. She left on October 7th. She didn't come back any other time in October. She didn't come back any time in November. She didn't come back any time in December. Had she come back at any of those times and said, you know, my condition, it's back again, it's not improving, it's still bothering me, they would have done a further workup. But the district court found, based on the expert's testimony, that a CT scan was not required. And had a CT scan been required... You've come back. They just brush her off. It's like going to the high school nurse there, as far as I can tell from the record. Your Honor, I don't believe the record reflects that. I believe if you look at the visits where she showed up, her claim in this original case was that from 1998 until 2003, she repeatedly went to the doctors at Kanatkanak Hospital and complained about ovarian cancer symptoms, abdomen pain, distension, losing weight. When we went through the actual records, the government established... And she gave them the history of cancer in her family. That she gave at some times. But her claim wasn't that it was based on history. It was, I had this ongoing symptomatic problem, and they just ignored my symptoms. I would tell them that I have abdominal pain, and they wouldn't write it down. They would just ignore it. I would tell them that I had all these problems, and they didn't like me. They had it out for me, and they just ignored me and didn't provide me care. The medical records didn't document any of that. They documented that she had no complaints that were consistent with ovarian cancer until the first time she ever mentions pain in her uterus is December 2001. But again, she doesn't say, I've had a history of uterine pain. I've had this problem over the last several months. It's happened a number of times. She says in December 2001, well, yeah, I had uterus pain last week, but it's resolved. It's not bothering me anymore. And when Dr. Elliott followed up and said, well, let's talk about this, what it's like, she said that Mrs. Edgman said it was related to menstrual cramps. And there was no further discussion of it. And then through the rest of 2002, she never returns with a complaint. Doctors took their diagnosis from the patient instead of the other way around. From the patient's presentation. That is the way doctors diagnose. A patient tells them what their symptoms are, and a doctor listens to it and makes an assessment. Does a one-time mention of pain? Actually, no. They do not usually diagnose by saying, what is wrong with you? Well, I think I have menstrual cramps. Okay, goodbye. What they usually do is they listen to the symptoms, and they do some objective tests. They listen to the history. They rule out things that would be consistent with the symptoms and the objective tests and where a caution is raised on account of the history. And then they diagnose. I believe that is what Dr. Elliott did in the two visits that were done in December 2001. She took a history. She listened to Mrs. Edgman's complaints. She determined that Mrs. Edgman, the focus of her complaint on December 12th was her lower back pain. She treated her for the lower back pain. Mrs. Edgman appeared to improve from that. She had her come back a week later. She assessed her again. And at that second visit, Mrs. Edgman didn't come back and say, you know, I'm still being bothered with that uterus pain that I mentioned earlier, or I'm having further symptoms. Because of its uterus pain, I know somebody who died of lung cancer that manifested as a symptom of pain in the low back on the left side. I mean, the doctors don't just ask, where does it hurt? Oh, it hurts in my uterus. I think it's my pancreas. No, the problem with ovarian cancer, Your Honor, is that the symptoms are very difficult. And so what the government's experts explain- So they do objective tests. But before you get to the objective tests, the government's experts said in order to assess a patient for ovarian cancer, what they are looking for is a particular pattern of symptoms. It's not just coming in once and saying, I have a pain in my abdomen, or I had uterine pain two weeks ago, but it went away. It's a patient who comes in and says, I've been having repeated pain in my abdomen. I've been having a feeling of being bloated. I've been having problems with I eat half my meal and I'm full. I can't finish the rest of my meal, and it's happening frequently. It is those repeated, and Dr. Sines went through that at length. And, in fact, the district court relied on that specific- You keep arguing that there's no negligence. And the judge said at finding 34 it was a violation of the standard of care not to perform the appropriate medical exam in connection with her visit on October 4, 2002, either on that day or on a directed follow-up appointment. You keep trying to whitewash the doctors. Not at all. And I don't see how you can unless you say that finding's clearly erroneous. Not at all. What Judge Sedwick was finding was it was a breach of the standard of care not to do the annual screening exams, not a CT scan, and it was not a breach because of what her symptoms were. It was simply since she had a history of cancer and since you hadn't done the annual exam in December, then you should have done one in October. But that is a finding of breach based on you have a general protocol that for a patient like this with this family history you should do the screening exam, not because she has symptoms that make you think she has ovarian cancer, but because she's a patient at risk because of her family history. And Dr. Sine said that's true, but those screening exams aren't effective. Why, if the screening exams aren't effective and you know that you have someone with this kind of history, why don't they just do CT scans that would catch things more? Because in Dillingham, Your Honor, that would mean flying people on a jet to Anchorage every time you want to. Does it cost too much money? Does that change the standard of care? Well, yes, it does. It comes into account. You have to decide whether someone who comes in on an annual screening exam who doesn't have symptoms of ovarian cancer, are you going to say, let's fly you to Anchorage to have a CT scan even though we have no objective symptoms that justify that exam? That is part of the standard of care, yes. It's not a question of, well, we think you need it, but we don't want to spend the money. It's we don't think you need it, but should we do it just as a preventative, just as a possible that we might find it and spend the money. That is part of the standard. Who pays? Who pays for those? It depends who the patient is. If they're a beneficiary of the native care system, the native help. She's not native. She was not. So she would pay. Well, it depends. So it's really not a question of the government having to weigh the expense? It depends on what her insurance is. It depends on what her beneficiary status is because her husband was entitled to coverage. That issue was not part of the record. So I can't tell you for sure whether if she had made a claim to come into Anchorage. For example, when she finally was medevaced in January 3, she was not billed for that flight. That was a flight that she came in on. Was she medevaced? I thought she just flew down. Well, they immediately sent her on a plane to send her in, and they sent an escort with her, Miss Shade. And so it wasn't clear. I thought she flew because someone came up and said, you look too sick. And so she rounded up her friend, Miss Shade, and flew down commercially. Well, she had her friend take her to the ER, but it was the ER doctor who made a referral that she should go into Anchorage to be seen. And there was no development of the record as to who. You said medevaced. Was that true? No, they didn't put her on an immediate jet, but what I meant was a transport at that point. At that point it was a transport, and there was no evidence as to who paid for that transport, nor was there evidence as to who paid for Miss Shade. Here's what I'm getting at. You've given us this whole story that sounds like the government has to weigh whether to medevac her, but it looks like she was a medevac. The government doesn't pay. She pays herself. It's her business whether she does what she's advised to do, and if they tell her you go get a CT scan right away, there's some evidence she would have done what she was told, and there's no evidence that she wouldn't have. That's the picture of the record that I have, and then you're giving me a completely different picture of the record. I know what a medevac is. They fly up a Learjet that has medical equipment inside, and they get you right out, like with burn victims and brain injuries and stuff. And I don't think this was that case, but you're portraying it that way. Am I wrong on what the record is? I think we've gotten off track. Am I mixed up on what the facts are? On the findings, I believe you are, Your Honor. On the medevac? On the medevac, no. There was no medevac. But I was asked a hypothetical question. Oh, I thought it was a real question. The hypothetical question I was asked was whether, even though a CT scan isn't required, should you do it anyway, and I got into a response to that hypothetical, which is doctors don't just order scans just because they might be beneficial. Sure they do. If your leg hurts real bad and you think it's an athletic injury, and you say, gosh, my leg hurts real, real bad, and it hadn't gone away for weeks, I assume I just strained it, and the doctor asks you your history, and, well, I just got back from a trip outside, and he says, well, you may not know it, but getting back from a trip outside means you should probably get a CT scan to see if you have, say, deep venous thrombosis. We'd better rule it out, even though it's not probable. That's how they do that sort of thing. If that is the standard of care, and if that were testified to in this case, and an expert said, and the court ---- It wasn't? No. There was no testimony. Well, Dr. Gabby testified that he thought a CT scan should have been done. Dr. Sines ---- So you get referred for those things by your internal internist, and then you only go to the oncologist if you're diagnosed with cancer. In this case, the district court accepted the opinion of Dr. Sines and rejected the opinion of Dr. Gabby. There was a dispute of opinion. Dr. Gabby thought a CT scan should have been ordered in October. Dr. Sines said no, a CT scan was not justified, and the court accepted the opinion of Dr. Sines and said in that finding, finding 36, the court said Dr. Gabby opinioned that a CT scan was indicated. However, the court finds Dr. Sines' opinion more convincing and accepts her opinion. Dr. Sines indicated that the substantial improvement in misedgment symptoms and her x-rays in the follow-up indicated that there was no CT scan that was required, and the court finds that a CT scan was not indicated in October. The court resolved that factual dispute in favor of the government and said a CT scan was not required, and therefore if there was no breach by failure to do a CT scan, it becomes a failure to prove causation for a plaintiff to argue, well, you should have done a CT scan, and therefore that would have detected the cancer. The court found a CT scan was not required, and that's the distinction I was making in the hypothetical. All right. You're over your time, but we kept you for answering the question. Thank you. Thank you. I'd like to refer you to answer your questions about would she have gone. Clearly she would have gone because in her redirect what happened is if you look at Volume 2, she testified out of order because we had people by phone. In Volume 2 at page 134, I asked her, had they told you if you would have needed a CAT scan, would you have been able to do that right away? It goes on to page 1, would you have borrowed money even if you needed that? Well, I had sources get money definitely together, yes. I definitely and I would have definitely sought help of other people. Very clearly she testified to that. Now let's take it one other step. At page 127, approximately 127, 128, I asked her a different question. I said, if they offer you a pelvic ultrasound, would you have done it? She goes on to say she would have done it. If she had to pay for it, she would have came into Anchorage to do that. She would have borrowed the money, and that's at page 127, 128. There's a question that was raised by the court about, well, you didn't follow this. She didn't come back. At page 112 in Volume 1 of her testimony, she kind of tells you how she was treated out there. She was kind of blown off, and that's the way she figured. She went in there numerous times complaining, and they said, no big problem, no big problem. And so that's where the treatment occurs, and that's the way she was treated. Now let's go back to just the causation issue. Because with the court, on the three tests, Dr. Gavi clearly said she was never offered a pelvic ultrasound. They had that equipment out there, never done that. Their experts say you do a CA-125 with this person's history. In fact, Dr. Sands says the history requires, it's a red flag. She should be in a screening program, a CA-125, a pelvic ultrasound, and a pelvic exam. You do all three. You don't do one here and one there. You do all three. And that was never done. In October, those were never done. And on a more likely-to-not basis, the mass, what Gavi was saying, pelvic ultrasound would have showed earlier that she had a mass, and then they would have explored it. Now let's talk about my argument under 540. There's a case we called Himes v. Dramas, which is an Alaska case, about what you do with experts in that. Dr. Gavi is your basic, fundamental, first-line expert who sees people in clinics. Is he board-certified in internal medicine? Internal medicine, but he's also a hospitalist. It crosses areas. He's board-certified. Hospitalist doesn't really mean much, but he's board-certified in internal medicine? Yes. And he handles clinics. What Dr. Gavi does is essentially he is the first-line people as an internist. And like you said, what he does is he says, okay, you've got this problem here. You need these tests. In other words, we need to find out what the bowel obstruction is. Plus, you have a history of cancer. What Dr. Wallace said, they didn't even look at her history of cancer. Dr. Sain says that's a red flag. All the doctors, the experts say they're red flags, but they never look. Dr. Gavi says you get the following. You get those tests. Plus, I want to find out what the bowel obstruction is. I want to follow that up because that is what the internist, the hospitalist, the people in the clinic need to do, is to find out the basis of bowel obstruction. She goes back and she's saying, well, just a flu. You know, you're okay. Go away. And so she doesn't get the follow-up treatment even for a bowel obstruction. She could have, in this particular case, had a bowel obstruction that killed her, but she didn't even get the basic follow-up care to say when you're having problems with this, get a CT scan, go into Anchorage, follow up with a gastroenterologist. That's all I have, unless there's any other questions. Thank you both for your argument. There do not appear to be additional questions. Thank you both for your argument. This matter will stand submitted.
judges: B Fletcher, Kleinfeld, Callahan, Cjj